80 U.S. 581 (____)
13 Wall. 581
BLYEW ET AL.
v.
UNITED STATES.
Supreme Court of United States.

*585 Messrs. J.S. Black and I. Caldwell, for the State of Kentucky.
*590 Mr. Justice STRONG delivered the opinion of the court.
Addressing ourselves to the first of the questions presented by the record  the question of jurisdiction  it may be remarked that clearly the Circuit Court had no jurisdiction of the crime of murder committed within the district of Kentucky, unless it was conferred by the third section of the act of Congress of April 9th, 1866.
It must be admitted that the crimes and offences of which the District Courts are, by this section, given exclusive jurisdiction, are only those which are against the provisions of the act, or those enumerated in the second and sixth sections, and that the "causes, civil and criminal," over which jurisdiction is, by the second clause of the section, conferred upon the District and Circuit Courts of the United States concurrently, are other than those of which exclusive jurisdiction is given to the District Courts. They are described *591 as causes "affecting persons who are denied, or cannot enforce in the courts or judicial tribunals of the State, or locality, where they may be, any of the rights secured to them by the first section of the act."
Was, then, the prosecution, or indictment, against these defendants a cause affecting any such person or persons? If it was, then by the provisions of the act it was within the jurisdiction of the court, and if it was not, that court had no jurisdiction.
It was, the record shows, an indictment for the murder of Lucy Armstrong, a citizen of the United States of the African race, and it contained an averment that other citizens of the United States of the same race, witnessed the alleged murder. It contained also an averment that those other persons, namely, Richard Foster and Laura Foster, as well as the deceased Lucy Armstrong, were, on account of their race and color, denied the right to testify against the defendants, or either of them, of and concerning the killing and murder, in the courts and judicial tribunals of the State of Kentucky.
We are thus brought to the question whether a criminal prosecution for a public offence is a cause "affecting," within the meaning of the act of Congress, persons who may be called to testify therein. Obviously the only parties to such a cause are the government and the persons indicted. They alone can be reached by any judgment that may be pronounced. No judgment can either enlarge or diminish the personal, relative, or property rights of any others than those who are parties. It is true there are some cases which may affect the rights of property of persons who are not parties to the record. Such cases, however, are all of a civil nature, and none of them even touch rights of person. But an indictment prosecuted by the government against an alleged criminal, is a cause in which none but the parties can have any concern, except what is common to all the members of the community. Those who may possibly be witnesses, either for the prosecution or for the defence, are no more affected by it than is every other person, for any one *592 may be called as a witness. It will not be thought that Congress intended to give to the District and Circuit Courts jurisdiction over all causes both civil and criminal. They have expressly confined it to causes affecting certain persons. And yet, if all those who may be called as witnesses in a case, and who may be alleged to be important witnesses, were intended to be described in the class of persons affected by it, and if the jurisdiction of the Federal courts can be invoked by the assertion that there are persons who may be witnesses, but who, because of their race or color, are incompetent to testify in the courts of the State, there is no cause either civil or criminal of which those courts may not at the option of either party take jurisdiction. The statute of Kentucky which was in existence when this indictment was found, and which denied the right of Richard Foster and Laura Foster to testify in the courts of the State, enacted as follows: "that a slave, negro, or Indian shall be a competent witness in the case of the commonwealth for or against a slave, negro, or Indian, or in a civil case to which only negroes or Indians are parties, but in no other case." It will be observed that this statute prohibits the testimony of colored persons either for or against a white person in any civil or criminal cause to which he may be a party. If, therefore, they are persons affected by the cause, whenever they might be witnesses were they competent to testify, it follows that in any suit between white citizens, jurisdiction might be taken by the Federal courts whenever it was alleged that a citizen of the African race was or might be an important witness. And such an allegation might always be made. So in all criminal prosecutions against white persons a similar allegation would call into existence the like jurisdiction. We cannot think that such was the purpose of Congress in the statute of April 9th, 1866. It would seem rather to have been to afford protection to persons of the colored race by giving to the Federal courts jurisdiction of cases, the decision of which might injuriously affect them either in their personal, relative, or property rights, whenever they are denied in the State courts any of the rights *593 mentioned and assured to them in the first section of the act.
Nor can it be said that such a construction allows little or no effect to the enactment. On the contrary, it concedes to it a far-reaching purpose. That purpose was to guard all the declared rights of colored persons, in all civil actions to which they may be parties in interest, by giving to the District and Circuit Courts of the United States jurisdiction of such actions whenever in the State courts any right enjoyed by white citizens is denied them. And in criminal prosecutions against them, it extends a like protection. We cannot be expected to be ignorant of the condition of things which existed when the statute was enacted, or of the evils which it was intended to remedy. It is well known that in many of the States, laws existed which subjected colored men convicted of criminal offences to punishments different from and often severer than those which were inflicted upon white persons convicted of similar offences. The modes of trial were also different, and the right of trial by jury was sometimes denied them. It is also well known that in many quarters prejudices existed against the colored race, which naturally affected the administration of justice in the State courts, and operated harshly when one of that race was a party accused. These were evils doubtless which the act of Congress had in view, and which it intended to remove. And so far as it reaches, it extends to both races the same rights, and the same means of vindicating them.
In view of these considerations we are of opinion that the case now before us is not within the provisions of the act of April 9th, 1866, and that the Circuit Court had not jurisdiction of the crime of murder committed in the district of Kentucky, merely because two persons who witnessed the murder were citizens of the African race, and for that reason incompetent by the law of Kentucky to testify in the courts of that State. They are not persons affected by the cause.
We need hardly add that the jurisdiction of the Circuit Court is not sustained by the fact averred in the indictment that Lucy Armstrong, the person murdered, was a citizen of *594 the African race, and for that reason denied the right to testify in the Kentucky courts. In no sense can she be said to be affected by the cause. Manifestly the act refers to persons in existence. She was the victim of the frightful outrage which gave rise to the cause, but she is beyond being affected by the cause itself.
The conclusions to which we have come are sustained, we think, fully by the judgment of this court in United States v. Ortega,[*] in which the opinion was delivered by Mr. Justice Washington. It was the case of an indictment in the Circuit Court for offering violence to the person of the Spanish minister, contrary to the law of nations and the act of Congress. The second section of the third article of the Constitution ordains that the judicial power of the United States shall extend to all cases affecting ambassadors, other public ministers and consuls, and that in all cases affecting ambassadors, other public ministers and consuls, the Supreme Court shall have original jurisdiction. The defendant was convicted, and on motion in arrest of judgment, the question was presented to this court (and it was the only one decided), whether it was a case affecting an ambassador, or other public minister. The court unanimously ruled that it was not. The violence out of which the indictment grew was committed upon a public minister, and he was a competent and material witness. But he was ruled to be not a person affected by the case, because it was a public prosecution instituted and conducted by and in the name of the United States, and for the purpose of vindicating the laws of nations and that of the United States, in the person of a public minister, offended by an assault committed on him by a private individual. It is, said the court, a case then, which affects the United States and the individual whom they seek to punish; but one in which the minister himself, although he was the person injured by the assault, has no concern, either in the event of the prosecution, or in the costs attending it. What was meant by the phrase "a case affecting," *595 was thus early defined, and we are bound to presume that Congress, when they used the same word "affecting" in the act of 1866, intended to have it bear its defined meaning. This is according to a well-known rule of construction.
An attempt has, however, been made to discriminate between the words "case affecting," as found in the constitutional provision, and the words "cause affecting," contained in the act of Congress. We are unable to perceive any substantial ground for a distinction. The words "case" and "cause" are constantly used as synonyms in statutes and judicial decisions, each meaning a proceeding in court, a suit, or action. Surely no court can have jurisdiction of either a case or a cause until it is presented in the form of an action. We regard, therefore, The United States v. Ortega as an authority directly in point to the effect that witnesses in a criminal prosecution are not persons affected by the cause. It necessarily results from this that jurisdiction of the offence for which these defendants were indicted, was not conferred upon the Circuit Court by the act of Congress.
It is unnecessary, therefore, to consider the other questions presented by the record.
JUDGMENT REVERSED.
The CHIEF JUSTICE was not present at the argument, and took no part in the judgment.
Mr. Justice BRADLEY, with whom concurred Mr. Justice SWAYNE, dissenting.
I dissent from the opinion of the court in this case for the following reasons:
The civil rights bill (passed April 9th, 1866, and under which the indictment in this case was found and prosecuted) was primarily intended to carry out, in all its length and breadth, and to all its legitimate consequences, the then recent constitutional amendment abolishing slavery in the United States, and to place persons of African descent on an equality of rights and privileges with other citizens of the United States. To do this effectually it was not only necessary *596 to declare this equality and impose penalties for its violation, but, as far as practicable, to counteract those unjust and discriminating laws of some of the States by which persons of African descent were subjected to punishments of peculiar harshness and ignominy, and deprived of rights and privileges enjoyed by white citizens.
This general scope and object of the act will often furnish us a clue to its just construction. It may be remarked, however, that the terms of the act are broad enough to embrace other persons as well as those of African descent, but that is a point not now in question in this case.
The first section declares that all persons born in the United States, not subject to a foreign power, and not including untaxed Indians, are citizens of the United States, and that such citizens, of every race and color, without regard to previous condition of slavery, shall have the same right, in every State and Territory in the United States, to make and enforce contracts; to sue, be parties, and give evidence; to inherit, purchase, lease, sell, hold, and convey real and personal property, and to the full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law or custom to the contrary notwithstanding.
This is the fundamental section of the act. All that follows is intended to secure and vindicate, to the objects of it, the rights herein declared, and to establish the requisite machinery for that end.
This section is in direct conflict with those State laws which forbade a free colored person to remove to or pass through the State, from having firearms, from exercising the functions of a minister of the gospel, and from keeping a house of entertainment; laws which prohibited all colored persons from being taught to read and write, from holding or conveying property, and from being witnesses in any case where a white person was concerned; and laws which subjected them to cruel and ignominious punishments not imposed upon white persons, such as to be sold as vagrants, to *597 be tied to the whipping-post, &c., &c. All these, and all other discriminations, were intended to be abolished and done away with.
The second section makes it a misdemeanor, punishable by fine or imprisonment, for any person, under color of any law or custom, to deprive any inhabitant of a State or Territory of any right secured by the act, or to subject him to different punishment or penalties on account of his having been a slave, or by reason of his color or race, than is prescribed for the punishment of white persons.
The third section proceeds to confer upon the District Courts of the United States, exclusive of the State courts, jurisdiction to try these offences, and then follows the clause under which the indictment in the present case was found, declaring that the said District Courts shall also have cognizance, concurrently with the Circuit Courts of the United States, "of all causes, civil and criminal, affecting persons who are denied, or cannot enforce in the courts or judicial tribunals of the State, or locality where they may be, any of the rights secured to them by the first section," with right of removal of causes from State courts, &c. It is evident that the provisions of the second section, making it a criminal offence to deprive a person of his rights, or to subject him to a discriminating punishment, would fail to reach a great number of cases which the broad and liberal provisions of the first section were intended to cover and protect. The clause in question is intended to reach these cases, or, at least, a large class of them. It provides a remedy where the State refuses to give one; where the mischief consists in inaction or refusal to act, or refusal to give requisite relief; whereas the second section provides for actual, positive invasion of rights. Thus, if the State should refuse to allow a freedman to sue in its courts, thereby denying him judicial relief, or should fail to provide laws for the punishment of white persons guilty of criminal acts against his person or property, thereby denying him judicial redress, there can be no doubt that the case would come within the scope of the clause under consideration. Suppose that, in any State, *598 assault and battery, mayhem  nay, murder itself, could be perpetrated upon a colored man with impunity, no law being provided for punishing the offender, would not that be a case of denial of rights to the colored population of that State? Would not the clause of the civil rights bill now under consideration give jurisdiction to the United States courts in such a case? Yet, if an indictment should be found in one of those courts against the offender, the technical parties to the record would only be the United States as plaintiff and the criminal as defendant. Nevertheless could it be said, with any truth or justice, that this would not be a cause affecting persons denied the rights secured to them by the first section of the law?
The case before us is just as clearly within the scope of the law as such a case would be. I do not put it upon the ground that the witnesses of the murder, or some of them, are colored persons, disqualified by the laws of Kentucky to testify, but on the ground that the cause is one affecting the person murdered, as well as the whole class of persons to which she belonged. Had the case been simple assault and battery, the injured party would have been deprived of a right, enjoyed by every white citizen, of entering a complaint before a magistrate, or the grand jury, and of appearing as a witness on the trial of the offender. I say "right," for it is a right, an inestimable right, that of invoking the penalties of the law upon those who criminally or feloniously attack our persons or our property. Civil society has deprived us of the natural right of avenging ourselves, but it has preserved to us, all the more jealously, the right of bringing the offender to justice. By the common law of England the injured party was the actual prosecutor of criminal offences, although the proceeding was in the king's name; but in felonies, which involved a forfeiture to the crown of the criminal's property, it was also the duty of the crown officers to superintend the prosecution. And, although in this country it is almost the universal practice to appoint public and official prosecutors in criminal cases, yet it is the right of the injured party, and a duty he owes to society, to *599 furnish what aid he can in bringing the offender to justice; and an important part of that right and duty consists in giving evidence against him.
To deprive a whole class of the community of this right, to refuse their evidence and their sworn complaints, is to brand them with a badge of slavery; is to expose them to wanton insults and fiendish assaults; is to leave their lives, their families, and their property unprotected by law. It gives unrestricted license and impunity to vindictive outlaws and felons to rush upon these helpless people and kill and slay them at will, as was done in this case. To say that actions or prosecutions intended for the redress of such outrages are not "causes affecting the persons" who are the victims of them, is to take, it seems to me, a view of the law too narrow, too technical, and too forgetful of the liberal objects it had in view. If, in such a raid as I have supposed, a colored person is merely wounded or maimed, but is still capable of making complaint, and on appearing to do so, has the doors of justice shut in his face on the ground that he is a colored person, and cannot testify against a white citizen, it seems to me almost a stultification of the law to say that the case is not within its scope. Let us read it once more: "The District Courts shall, concurrently with the Circuit Courts, have cognizance of all causes, civil and criminal, affecting persons who are denied or cannot enforce in the courts or judicial tribunals of the State or locality where they may be, any of the rights secured to them by the first section of this act."
If the case above supposed is within the act (as it assuredly must be), does it cease to be so when the violence offered is so great as to deprive the victim of life? Such a construction would be a premium on murder. If mere violence offered to a colored person (who, by the law of Kentucky, was denied the privilege of complaint), gives the United States court jurisdiction, when such violence is short of being fatal, that jurisdiction cannot cease when death is the result. The reason for its existence is stronger than before. If it would have been a cause affecting him when living, it will *600 be a cause affecting him though dead. The object of prosecution and punishment is to prevent crime, as well as to vindicate public justice. The fear of it, the anticipation of it, stands between the assassin and his victim like a vindictive shade. It arrests his arm, and loosens the dagger from his grasp. Should not the colored man have the aegis of this protection to guard his life, as well as to guard his limbs, or his property? Should he not enjoy it in equal degree with the white citizen? In a large and just sense, can a prosecution for his murder affect him any less than a prosecution for an assault upon him? He is interested in both alike. They are his protection against violence and wrong. At all events it cannot be denied that the entire class of persons under disability is affected by prosecutions for wrongs done to one of their number, in which they are not permitted to testify in the State courts.
I am well aware of the case of Ortega, who was indicted in the Circuit Court for offering violence to the person of the Spanish minister. The defendant claimed that it was "a case affecting a public minister," and under the Constitution cognizable only in the Supreme Court. But the court, taking the strict and technical view, decided that, being a criminal case, in which the United States was plaintiff and the offender was defendant, they only were the parties whom the case affected. Conceding that this decision was good law for the purposes of that case, I do not feel that I am bound by it in this. The effect of that decision was, that the Constitution in giving the Supreme Court jurisdiction in cases affecting ambassadors, other public ministers and consuls, only intended to give these public persons the right to sue and be sued in the Supreme Court. In the case before us, I think Congress meant a great deal more than this when it gave the United States courts cognizance of all causes, civil and criminal, affecting persons who are denied or cannot enforce in the courts of the State any of the rights secured by the first section of the act.
I have considered the case irrespective of the fact that the witnesses of the transaction were all colored people who, at *601 the time this indictment was found, were denied the right to testify against white persons in Kentucky. I have placed it on the sole ground, that prosecutions for crimes committed against colored persons, are causes which, in the sense of the civil rights bill, most seriously affect them; and that in Kentucky they were denied the privilege of being witnesses in these causes. I do not mean to be understood as saying that every cause in which a colored person may be called as a witness, for that reason belongs to the cognizance of the United States courts. In ordinary cases of a civil character, the party calling such a person as a witness is the person affected. Such party, be he black or white, may except to the rejection of his witness, and bring the case to this court by writ of error from the State court of last resort under the 25th section of the Judiciary Act. A defendant in a criminal prosecution may do the same thing where a bill of exceptions is allowed in criminal cases.
To conclude, I have no doubt of the power of Congress to pass the law now under consideration. Slavery, when it existed, extended its influence in every direction, depressing and disfranchising the slave and his race in every possible way. Hence, in order to give full effect to the National will in abolishing slavery, it was necessary in some way to counteract these various disabilities and the effects flowing from them. Merely striking off the fetters of the slave, without removing the incidents and consequences of slavery, would hardly have been a boon to the colored race. Hence, also, the amendment abolishing slavery was supplemented by a clause giving Congress power to enforce it by appropriate legislation. No law was necessary to abolish slavery; the amendment did that. The power to enforce the amendment by appropriate legislation must be a power to do away with the incidents and consequences of slavery, and to instate the freedmen in the full enjoyment of that civil liberty and equality which the abolition of slavery meant.
In my opinion the judgment of the Circuit Court should be affirmed.
NOTES
[*] 11 Wheaton, 467.